**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GEOFFREY L. LONG,<br>      **Plaintiff,**<br><br>     **v.**<br><br>UNITED RENTALS (NORTH AMERICA,<br>INC.) AND POWER TECHNIQUE<br>NORTH AMERICA LLC,<br>      **Defendants.** | **CIVIL ACTION**<br><br><br><br><br>**NO.  25CV4432** |

## MEMORANDUM OPINION

Plaintiff Geoffrey Long brings this action against Defendants Power Technique North America LLC ("Power Technique") and United Rentals (North America, Inc.) ("United Rentals"), asserting claims for strict products liability, negligent products liability, and breach of warranty.  Long alleges that he sustained life-altering injuries, including significant injuries to his cervical spine, when an access door of a portable air compressor fell on him while he was inspecting the machine in the course of his employment as a General Foreman at a job site in New Jersey.  Defendants have each moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(a).  For the reasons that follow, Power Technique's Motion shall be granted in part and denied in part and United Rentals' Motion shall be denied.

### I.    FACTUAL BACKGROUND

The compressor involved in this incident was an Atlas Copco/Power Technique XAS900 portable air compressor, serial number HOP081748.  Power Technique designed, manufactured, and sold the compressor to United Rentals.  Long's employer, Nooter Construction, rented the compressor from United Rentals for use at Long's job site.  Under the rental arrangement, United Rentals was responsible for providing routine and preventative maintenance on the machine.

1

The compressor has two hinged access doors, one on each side of the machine. Each door is held open, when fully raised, by two gas spring struts. The struts on both sides are affixed to the machine in the same manner and perform the same function: supporting the access doors while opened. The compressor's instruction manual contains a section titled "Safety During Use and Operation." That section provides: "All doors shall be shut during operation so as not to disturb the cooling air flow inside the bodywork and/or render the silencing less effective. A door should be kept open for a short period only e.g. for inspection or adjustment." It is disputed whether or not Long read the manual for this specific compressor.

United Rentals' ordinary maintenance practice was to inspect the compressor before it was sent out on its next rental. As part of that process, the doors would be opened so that the engine compartment and fluids could be checked. If the door struts were not functioning properly, United Rentals would identify the condition during that inspection and replace them as needed. Outside of routine maintenance, United Rentals generally performed repairs only when called.

In August 2023, approximately two months before the incident at issue, the gas struts on the left-side access door failed. Long contacted United Rentals and authorized the replacement of those struts. Long had not experienced any problems with the right-side access door.

That changed on the morning of October 5, 2023. Long was performing a routine pre-start inspection of the compressor. He opened the right-side access door and began the start-up sequence to warm the engine. Shortly after starting the machine, he walked away to return a container of diesel exhaust fluid ("DEF") to a pallet. As he did so, he observed the compressor begin to "idle very rough" and "shake violently," which he described as a "shimmy back and forth" accompanied by rattling metal. Concerned that the machine would enter a shutdown

2

mode, which would require a significant wait time before it could be restarted, Long returned to the compressor to inspect the readiness monitor and check a blow-off valve located under the right-side access door.

The compressor was still running, and the right-side access door remained open, as Long inspected the machine. While he was in that area, he bent down to scratch his ankle. As he stood back up to check the tightness of a cap, the right-side access door's gas struts allegedly failed. It fell and struck Long in between his ear and spine, below the base of his skull. According to Long, the force of the impact knocked him down and caused him to go down to one knee. Immediately afterward, Long tried to "gather [his] bearings" and "shake it off." He was not bleeding and did not believe he needed to go to the emergency room at that time. As the day progressed, however, he began to develop a worsening headache. He also reported the incident to his employer.

No one other than Long witnessed the door strike him. His colleague, Anthony Hallam, was on the opposite side of the tank and arrived only after the incident occurred. Long testified that, after the incident, the right-side door continued to fail and would immediately fall after being opened. He demonstrated that condition to the site safety officer, Eric, whose last name is unknown, and to Hallam.

According to Long, the compressor remained on site after the incident and continued to be used by other crew members. Long testified that he contacted United Rentals the week after the incident and reported that the door needed to be serviced, but he was not aware of anyone coming to address it. According to Long, until the compressor was returned to United Rentals in mid-October, the door had to be propped open with a two-by-four or four-by-four piece of wood, or held open by another person, whenever service was performed.

3

United Rentals and Power Technique maintain that they were not aware of the incident before this lawsuit was filed. Both assert that the right-side door was in good working condition when fully opened. Robert Sowers, testifying on behalf of United Rentals, stated that he was only aware of the August 2023 replacement of the two gas struts on the left-side access door. Sowers further testified that, if struts had been replaced, there would be a work order documenting that replacement. He was not aware of any work order reflecting replacement of the right-side access door struts until February 15, 2025.

Long disputes that account. He points to an October 19, 2023, work order listing "minor repairs," although the work order does not specify what those repairs were. The record also includes an October 19, 2023, Condition Report, stating that the "[e]quipment [was] clean and in good condition," and noting no deficiencies. The photographs included with that report, however, are the only photographs among the condition reports produced that show the right-side access door open, and one photograph appears to show a blue marking on one of the gas struts.

After the incident, Long spoke with a doctor, who advised him to rest, ice the area, and take Advil. In addition to the headaches, Long experienced shoulder pain, tingling, numbness, and a lack of sensation in his right hand. A few weeks after the incident, Long underwent a CT scan and began receiving treatment for those symptoms.

## II.    MOTION TO EXCLUDE PLAINTIFF'S EXPERT

Before addressing Defendants' motions for summary judgment, it is necessary to first address Defendants' motions to exclude the expert report and testimony of Craig Clauser pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Defendants' Motions will be denied.

Clauser is an engineer with over fifty years of experience in industrial safety, machinery

safeguarding, failure analysis of mechanical and structural devices, and accident investigation. He has particular expertise in metallurgical engineering and materials science, and safety engineering. Clauser visited a United Rentals facility in Allentown, Pennsylvania to inspect the subject compressor. By that time, however, the gas springs on the compressor were post incident replacements, and the incident spring was no longer available for examination.

In his report and testimony, Clauser concluded that the incident and Long's injury occurred because the subject air compressor was a "defectively designed product."[1] Specifically, he opined that "the design did not address the hazard of a gas spring failure allowing a door to drop and strike a user." Clauser also opined that United Rentals "failed to maintain the compressor."

Clauser explained that:

> [t]he subject door is supported by gas springs. Gas is compressed in the spring cylinder and the pressure of the gas against spring piston rod produces a spring force. The springs are attached to the doors (two springs per door) in a manner such that the spring force counteracts the weight of the door and serves to hold the door open in the fully raised position.

Clauser further stated that "air springs have a limited life expectancy," and that, depending on the service environment, "they could last five to six years before failing." According to Clauser, the springs "could fail slowly as the result of a slow gas leak," which could warn a user that "failure was imminent" as the spring's effectiveness decreased. Alternatively, the springs "could fail catastrophically as the result of a rapid gas leak without giving any warning." Clauser opined that, "if one spring failed suddenly, the door would drop unexpectedly." He further stated

---

[1] Experts cannot, of course, testify as to the ultimate legal question at issue and will not be allowed to do so at trial. *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) ("Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion.") (quoting Fed. R. Evid. 704(a)).

that this condition "presents a hazard to the user of being struck by a dropping door as Mr. Long was," and that the "equipment should be redesigned to eliminate the hazard."

Although Clauser acknowledged that it is "not possible to design out the potential for a spring to fail suddenly and without warning," he opined that "it was possible to safeguard the system from an unexpected door drop when the user is under the door by incorporating manual backup support that would hold the door if a spring failed." Clauser also opined that Power Technique could have provided warnings on the compressor and in the manual advising that the air springs were susceptible to unexpected failure and that users should not rely on them as the sole means of support.

### A. Legal Standard

Federal Rule of Evidence 702—amended in response to the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)—governs the admissibility of expert testimony in federal court, providing:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 597 (explaining that Rule 702 assigns a "gatekeeping role" to federal courts with respect to expert testimony). Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability[,] and fit." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). Although Defendants' position is not entirely clear, they appear to challenge only the reliability of Clauser's testimony.

6

**B. Discussion**

*Daubert* and Rule 702's reliability requirement demand that an expert's opinion rest on "good grounds" rather than on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590 (quotation marks and citation omitted). In *Daubert*, the Supreme Court identified several factors courts may consider in assessing "whether a theory or technique is scientific knowledge," including whether the theory can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error, the existence and maintenance of standards controlling the technique's operation, and its general acceptance within the community. *Id.* at 593-94; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994) (summarizing important reliability factors in this Circuit).

Although *Daubert* was a case about scientific knowledge, "there are many different kinds of experts, and many different kinds of expertise." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). Accordingly, "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.*; *see also Pineda v. Ford Motor Co.*, 520 F.3d 237, 248 (3d Cir. 2008) (recognizing that *Daubert*'s reliability factors "'are neither exhaustive nor applicable in every case.'" (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806-07 (3d Cir. 1997)). The reliability inquiry is "flexible," and a district court enjoys "broad latitude when it decides how to determine reliability." *Kumho Tire*, 526 U.S. at 141-42.

Here, Defendants maintain that Clauser's testimony is unreliable because: (1) it relies on insufficient facts or data; (2) his opinions regarding alternative designs and warnings are not based on reliable principles and methods and do not reflect a reliable application of the principles and methods; and, (3) his testimony regarding warnings or instructions lacks an analytical and

7

proper basis.

### i.   Insufficient Facts or Data

Defendants first argue that Clauser's testimony should be excluded insofar as it rests on insufficient facts or data, specifically an "assumption" that the gas strut failed. Federal Rule of Evidence 702(b) permits expert testimony only where "the proponent demonstrates to the court that it is more likely than not that . . . the testimony is based on sufficient facts or data." Fed. R. Evid. 702(b). Defendants contend that Clauser's testimony should be excluded in its entirety because it depends on Long's eyewitness testimony that the gas strut failed. Long correctly responds that such reliance is permissible.

Even if Defendants dispute Long's account of the gas strut failure, "[a]n expert is . . . permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury." *See Walker v. Gordon*, 46 F. App'x 691, 695-96 (3d Cir. Sept. 17, 2002); *see also* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."). Although Clauser was unable to inspect or test the gas struts on the compressor at the time of the incident because they were no longer on the machine, he based his opinion on Long's testimony that the gas strut failed, assuming it had reached its life expectancy, causing the purported unexpected closing of the door while Long was underneath it.

In *Weston v. Farberware Licensing Co., LLC*, Clauser, also the expert in that case, was unable to inspect the pressure cooker at issue "because it was missing certain necessary parts when it was delivered for testing." 2025 WL 2206864, at *2 (E.D. Pa. May 12, 2025). Clauser nevertheless "examined, used, and disassembled an exemplar Farberware pressure cooker of the same model as that used by plaintiff." *Id*. He paired that examination with deposition testimony

from the plaintiff and her daughter that the cooker's "contents suddenly and forcefully erupted out of the cooker immediately after she opened the lid without any trouble." *Id*. at *4. The court found that "[r]eliance by an expert on this evidence is proper." *Id*.

So too here. Clauser was unable to inspect the gas strut at issue, which Defendants' own expert opines likely were discarded,[2] and instead inspected the machine with new gas struts installed. He paired that inspection with reliance on Long's testimony that the door fell on him after the gas strut had failed. The Court finds that reliance on this evidence is sufficient. Any challenges to the credibility of Long's testimony that the gas strut failed are better left with the jury, not the judge. *See Breidor v. Sears, Roebuck and Co.,* 722 F.2d 1134, 1138-39 (3d Cir. 1983) ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge.").

Defendants also argue that Long's eyewitness testimony is an insufficient fact to support Clauser's conclusions because Clauser, in relying on that fact, "performed no analysis into why the gas struts did not need to be replaced until February 2025 by United Rentals." Long responds, and this Court agrees, that Defendants misconstrue Clauser's testimony. At his deposition, Clauser stated: "I don't know that they weren't replaced, and I did not really put any analysis into that." That is not the same as Clauser admitting that "he performed no analysis into why the gas struts were not replaced until February 2025." Rather, Clauser's testimony reflects that he did not analyze Defendants' own factual premise that the struts were not replaced.

The parties dispute whether the struts were replaced. Long points to an October 19, 2023, work order reflecting "minor repairs" performed on the subject machine weeks after the accident, which, he contends, could refer to the failed struts. Whether the struts were replaced is

---

[2] Sowers testified that when gas struts fail, they are typically "thrown out."

9

a factual question for the jury. Once resolved, that factual dispute may bear on the weight the jury gives Clauser's testimony, but it does not render the testimony inadmissible.

Finally, Defendants argue that Long's eyewitness testimony is insufficient because Clauser did not rule out alternative explanations. Specifically, Defendants argue that Long does not account for the possibility the door was not fully open or that the compressor's operation provided additional movement that caused the door to drop. Although this argument may be better understood as an attack on Clauser's methodology, *see*, *e.g.*, *Weston*, 2025 WL 2206864, at *4 ("Courts throughout the Third Circuit have admitted testimony based on process-of-elimination *methodologies* where experts consider all identified possibilities.") (emphasis added), where alternative explanations conflict with eyewitness testimony, an expert may rely on the eyewitness account. *See id.* (concluding that defendants' "alternative explanations" ran "headlong into plaintiff's testimony, on which [the expert] is entitled to rely").

Clearly, at trial there will be robust examination and cross-examination by the parties of Clauser. Defendants, no doubt, will present him with evidence that they maintain undermines his conclusions. Thus, the jury will be presented with competing theories as to why the strut failed and will be able to decide for themselves which theory they believe. But that there are differences of opinion as to why it did is not a reason to exclude Clauser's testimony.

### ii.    *Reliable Principles and Methods*

Federal Rule of Evidence 702(c) provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that . . . the testimony is the product of reliable principles and methods." Fed. R. Evid. 702(c). Defendants challenge Clauser's alternative-design opinions on the ground that he proposed those alternatives

10

without "testing, data analysis, or calculations," and instead merely "show[ed] a picture of the two alternatives without any diagrams." In Defendants' view, that omission renders his methodology unreliable.

Defendants principally rely on *Rossano v. Maxon*, where the Court observed that "[c]ourts generally look for alternative design experts to provide evidence of calculations, diagrams, or tests to support their opinions." 659 F. Supp.3d 559, 570 (E.D. Pa. 2023). Such testing may be important because "alternative designs based on engineering principles . . . rely on established principles of physics, material sciences, and industrial design and often utilize technologically sophisticated and carefully calibrated testing methods and devices." *Id.* at 568.

But the absence of testing, standing alone, does not render an alternative-design opinion unreliable *per se. See Elgert v. Siemens Indus. Inc.*, 2019 WL 1294819, at *5-6 (E.D. Pa. Mar. 20, 2019) (finding an expert's opinion reliable where it was based on his "practical experience" as an engineer and his review of the record, despite him not citing peer-reviewed literature or generally accepted practices); *see also Ahner v. Black Bros. Co.*, 2008 WL 2880382, at *2 (W.D. Pa. May 11, 2008) ("[W]e will not exclude Dr. Knott's proffered expert testimony as inherently unreliable because he did not identify or test actual alternative designs for the machine."); *McPeak v. Direct Outdoor Prods., LLC*, 2022 WL 4369966, at *5 (E.D. Pa. Sept. 20, 2022) (allowing an expert to opine a "potential feasible solution" to a design defect despite the expert not testing whether this design was feasible). In some circumstances, an expert's "significant educational and practical experience" may provide a sufficient basis for the opinion. *See Bloom v. Med. Depot, Inc.*, 2025 WL 2803913, at *11 (E.D. Pa. Sept. 30, 2025) (finding the methodology underlying the proposed alternative design reliable where it was based on the expert's "significant educational and practical experience").

11

Here, Clauser's opinion concerning the formation and necessity of alternative designs rests on his substantial experience, his personal inspection of the compressor, his review of the record, and his application of the Order of Precedence or Safety Hierarchy.  Clauser testified that the Order of Precedence or Safety Hierarchy is a "basic principle of safety engineering".  As he explained it, the principle first calls for redesigning a product to eliminate a hazard.  If the hazard cannot be eliminated without destroying the equipment's utility, the next step is to safeguard against the hazard.  Clauser further testified that this principle is not novel; it was included in the National Safety Council's 1964 fifth edition of the Accident Prevention Manual for Industrial Operations.

This case is also materially different from *Rossano*.  There, the proposed alternative designs purported to reduce the amount of force required to operate a liftgate, where the claimed defect concerned the amount of force necessary to open it.  659 F. Supp.3d at 563.  The expert, however, failed to "provide calculations of how the alternative designs would reduce the force needed to operate the liftgate at issue." *Id*. at 571.  In that context, calculations and quantitative analysis were important because some amount of force would necessarily be required to operate the liftgate, and the proposed design depended on reducing that force to an acceptable level.

Here, by contrast, the alleged hazard is not that the compressor door required too much or too little force to operate; it is that the door could unexpectedly fall when a gas spring failed.  The proposed alternative is a backup support intended to prevent an unexpected door drop if a gas spring fails.  Under these circumstances, the absence of quantitative calculations does not render Clauser's methodology unreliable.

Accordingly, any lack of testing goes to the weight of Clauser's opinion, not its admissibility. *See Montgomery v. Bobst Mex SA*, 2026 WL 1091995, at \*5 (E.D. Pa. Apr. 22,

2026) ("Mr. O'Donel's failure to test whether an interlocked panel would have prevented the accident or to provide drawings or mock-ups of his alternative design goes to the weight of his opinion and not its admissibility."); *English v. Crown Equip. Corp.*, 2016 WL 614680, at *10 (M.D. Pa. Feb. 16, 2016) (finding that an expert's failure to conduct tests went "to the weight of his opinion and not to its reliability" where he "explained the rationale for his alternative designs").

Defendants separately argue that Clauser's methodology in providing alternative designs is insufficient because he did not independently test the lifespan of a gas strut. But Clauser's report makes clear that he relied on the testimony of Mark MacInnis, Power Technique's former Vice President of Engineering for its Portable Power and Flow Division, regarding the lifespan of the struts. MacInnis testified that it would be unlikely "if there was anyone in the globe who knew more about this product than me." Clauser's reliance on that testimony is permissible. *See St. Paul Fire & Marine Ins. Co. v. Nolen Grp., Inc.*, 2005 WL 1168380, at *9 (E.D. Pa. May 13, 2005) (recognizing that experts "may rely on the work of others" in forming their opinions).

Defendants further contend that, although Clauser relied on MacInnis's testimony, he failed to account for the variables MacInnis identified as affecting the lifespan of a gas strut. The record does not support that characterization. MacInnis testified that determining the lifespan of a gas strut is "very difficult to say" and "depends completely on the amount of use that is being applied to the equipment." But he also qualified that answer by explaining that, if the doors were opened every day, the struts would last "five or six years." Clauser incorporated that qualification into his report, stating that "*depending on the service environment* [the gas struts] could last five to six years before failing." (emphasis added).

Defendants also argue that Clauser failed to account for testimony that there would be

13

indicia of a gas strut failing over time, such that a user could request or implement a repair before a sudden failure occurred.  But MacInnis testified not only that a gas strut could fail slowly over time, but he also confirmed that the charge inside the strut "could be completely dissipated in one go."  Thus, Clauser's opinion that the product should have guarded against sudden gas-strut failure is consistent with MacInnis's testimony that such a failure mode was possible.

Finally, Defendants fault Clauser because they aver that no manufacturer has implemented his proposed alternative design.  But Defendants do not meaningfully explain how that fact renders Clauser's methodology unreliable and cite no authority imposing a categorical requirement that an expert demonstrate industry use of the precise alternative design he proposes.  Absent developed argument and supporting authority, this contention is forfeited.  *See Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("[A]n argument consisting of no more than a conclusory assertion such as the one made here . . . will be deemed waived."); Local Rule 7.1(c) ("Every motion not certified as uncontested, or not governed by Local Civil Rule 26.1(g), shall be accompanied by a brief containing a concise statement of the legal contentions and authorities relied upon in support of the motion.") (emphasis added); *see also United States v. Heatherly*, 985 F.3d 254, 270 (3d Cir. 2021) (treating failure to "develop[ ] . . . arguments properly" as forfeiture).

### iii.    *Warnings or Instructions Testimony*[3]

Defendants also challenge Clauser's warning opinion that Power Technique should have

---

[3] Defendants cite *Weston*, a non-binding decision, for the proposition that Clauser's testimony regarding warnings or instructions should be excluded because Long did not read the manual that would have contained those warnings or instructions.  *See* 2025 WL 2206864, at *7 ("The applicability of the failure to warn theory is precluded as plaintiff concedes she did not examine the packaging for the cooker, never read the Farberware manual which accompanied the Farberware pressure cooker, and does not recall any of the on-product warnings."); *see also Wright v. Ryobi*

warned that "air springs were susceptible to unexpected failure" and that users should not rely on them as the sole means of support.  Defendants contend this opinion is improper because Clauser did not know the failure rate of the gas struts at issue, "did not know of any really sudden failure of a gas strut," and again asserts that Clauser does not know that a gas strut failed in the subject accident.

These arguments do not warrant exclusion of his testimony.  As discussed above, Clauser relied on Long's eyewitness testimony in concluding that a gas strut failed, and such reliance is permissible.  Clauser also relied on his personal inspection of the compressor, his review of the record, and his decades of experience in engineering, safety engineering, machinery safeguarding, failure analysis, and accident investigation.  Defendants' criticisms of the factual basis for his warning opinion may go to its weight, but they do not render the opinion inadmissible.

Defendants next argue that Clauser's opinion that Power Technique "could have provided instruction to the owner and maintainer of the compressor that the air springs, which Mr. MacInnis stated are inexpensive, should be replaced at a frequency that prevents end of life failures in service" is based on unsupported conjecture and speculation.  The record does not support that characterization.  Clauser acknowledged that the lifespan of a gas strut depends on the strut's usage and the environment in which it is used.  But that does not make replacement-

---

*Techs., Inc.*, 175 F. Supp.3d 439, 454 (E.D. Pa. 2016) ("It is mere speculation by Wright's expert that a warning on the rip fence itself . . . would somehow have altered Wright's behavior or otherwise prevented the accident, given that Wright actually did independently verify the alignment.").  But, "[t]o reach a jury on a failure-to-warn theory of liability, the evidence must support a reasonable inference, and not just a guess, that the existence of an adequate warning would have prevented the injury." *Id*. at 454.  Here, it is disputed whether Long did or did not read the manual.  Long testified that he has "seen the manuals that are provided within the machine upon delivery" and that, when a new compressor arrives at a job site, he typically reads the manuals for models with which he is unfamiliar.  Although Long testified that he was familiar with the subject model because he "had used one of these prior to this job starting," that testimony could support a reasonable inference that he had, at some point, reviewed the manual.

frequency information unknowable or speculative.  To the contrary, United Rentals, as the owner

and maintainer of the compressor, would be positioned to know how, where, and how often its

rental equipment was used.  United Rentals was also capable of determining when the struts on a

particular compressor had last been replaced.  And here, United Rentals had recently replaced the

gas struts on the compressor's other hinged access door before Long's accident.

Defendants further fault Clauser for not identifying similar replacement schedules for gas

struts across other industries and for not relying on specific industry standards governing regular

replacement of gas struts.  But the absence of industry standards or comparable replacement

schedules does not, by itself, require exclusion.  *See*, *e.g.*, *Pineda*, 520 F.3d at 248-49 ("Clauser

did not have to compare the language of the 2002 service manual with the language provided by

other manufacturers in order to render a reliable opinion that Ford's service manual failed to

provide adequate instructions or warnings.").  Accordingly, if anything, Defendants' criticisms

go to the weight of Clauser's warning and instruction opinions, not their admissibility.

### III.   SUMMARY JUDGMENT

#### A.  Legal Standard

Turning now to Defendants' motions for summary judgment, they may be granted if

Defendants "show[] that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might

affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  And a material fact is in "genuine dispute" where "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

A party seeking summary judgment always bears the initial responsibility of informing

the court of the basis for its motion and identifying the portions of the record that it believes

demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party would bear the ultimate burden of proof on an issue at trial, its motion must also demonstrate that "it has produced enough evidence to support the findings of fact necessary to win." *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 237 (3d Cir. 2007) (citations omitted). "If the moving party successfully points to evidence of all of the facts needed to decide the case on the law short of trial, the non-moving party can defeat summary judgment if it nonetheless produces or points to evidence in the record that creates a genuine issue of material fact." *Id.* at 238 (citing *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir. 1993)). In the absence of a genuine issue, the movant is entitled to summary judgment because a jury "would be compelled" to find the material facts in the movant's favor. *Id.*

Where the moving party has the burden of proof, the standard is particularly favorable to the nonmoving party. For one thing, a court is permitted to entertain "real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof." *El*, 479 F.3d at 238. Moreover, the nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

As a final note, only evidence that would be admissible at trial may be considered when deciding a motion for summary judgment. Fed. R. Civ. P. 56(c)(2); *Arnold Pontiac-GMC, Inc. v. Budd Baer, Inc.*, 826 F.2d 1335, 1339 n.3 (3d Cir. 1987).

### B. Discussion[4]

#### i.   *Implied Warranty of Fitness for a Particular Purpose*

Power Technique argues for summary judgment in its favor on Long's claim for breach

---

[4] Power Technique and United Rentals both move for summary judgment on the ground that Long is without

17

of implied warranty of fitness for a particular purpose, *see* 13 Pa. C.S. § 2315, because "there is no evidence in the record that the mobile air compressor was sold to United Rentals by Power Technique for any 'particular purpose' other than it is a mobile air compressor." Long does not respond to Power Technique's argument, and a review of the evidence of record shows he was right not to do so.

The implied warranty of fitness for a particular purpose only attaches when "the seller at the time of contracting has reason to know: (1) any particular purpose for which the goods are required; and (2) that the buyer is relying on the skill or judgment of the seller to select or furnish suitable goods." 13 Pa. C.S. § 2315. "'[P]articular purpose' differs from the 'ordinary purpose' for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business." *Gall ex rel. Gall v. Allegheny Cnty. Health Dept.*, 555 A.2d 786, 790 (Pa. 1989). For example, "shoes are generally used for the purpose of walking upon ordinary ground," in which case the general warranty of merchantability attaches. *Id.* (quoting 13 Pa. C.S. § 2315 cmt. 2). It is only if the seller knows "that a particular pair was selected to be used for climbing mountains" that they may be liable under the warranty of fitness for a particular purpose. *Id.*

The record evidence demonstrates that the mobile air compressor was sold by Power Technique to United Rentals, and subsequently rented to Long, to be a mobile air compressor, which is its general purpose and not for any "particular purpose." Long testified that an air compressor typically "blows air, and then you can hook hoses up to it to push pneumatic -- air for the pneumatic tools." He later testified that the subject air compressor was "delivered to our

---

supporting evidence for his claims if Clauser's testimony is excluded. Having determined that Clauser's testimony will not be excluded, these arguments fail.

18

site for . . . our air needs." The Court can find no testimony indicating that the subject air

compressor was used for any particular purpose beyond its ordinary use. Therefore, summary

judgment will be granted in favor of Power Technique on Long's claim for breach of implied

warranty of fitness for a particular purpose.

### ii.    Insufficient Evidence to Go to the Jury

Defendant United Rentals argues that summary judgment is warranted on any claim

against it for negligent failure to maintain the subject compressor, specifically its alleged failure

to replace the gas struts supporting the compressor door, because a jury could not find that

United Rentals failed to follow the applicable standard of care.

"To establish a cause of action in negligence, the plaintiff must demonstrate that the

defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach

resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage." *Martin v.*

*Evans*, 711 A.2d 458 (Pa. 1998). "While the existence of a duty is a question of law, whether

there has been a neglect of such duty is generally for the jury." *Emerich v. Philadelphia Ctr. for*

*Hum. Dev., Inc.*, 720 A.2d 1032, 1044 (Pa. 1998). Summary judgment is appropriate, however,

"when the case is free from doubt and there is no possibility that a reasonable jury could find

negligence." *Id*.

Assuming there is a duty here to act as a reasonable commercial equipment lessor would

under the circumstances,[5] United Rentals argues that Long fails to demonstrate breach.

Specifically, United Rentals contends that, in a case involving complex machinery, expert

testimony is required, and that the expert—not the jury—must define what acting as a

"reasonable commercial equipment lessor" would entail.

---

[5] Although United Rentals does not concede that it owed such a duty, it offers no argument to the contrary.

In United Rentals' view, the only expert testimony offered by Long on this issue is from Clauser. And because Clauser testified that it would be reasonable for United Rentals to follow manufacturer guidance, and because the manual did not contain any preventative-maintenance instruction requiring periodic replacement of the gas struts, United Rentals argues that no jury could find it failed to follow the applicable standard of care. United Rentals therefore contends that any negligence claim against it fails.[6]

United Rentals misstates the law. Although expert testimony is generally required where the subject matter involves complex machinery or technical issues beyond ordinary juror knowledge, *see*, *e.g. Storm v. Golden*, 538 A.2d 61, 64 (Pa. Super. 1988) ("[e]xpert testimony becomes necessary when the subject matter of the inquiry is one involving special skills and training not common to the ordinary lay person."), "[i]f all the primary facts can be accurately described to a jury and if the jury is as capable of comprehending" them as a specialist, "then there is no need for the testimony of an expert." *Reardon v. Meehan*, 227 A.2d 667, 670 (Pa. 1967). Additionally, United Rentals cites no case, and this Court has found none, establishing a *per se* rule that an expert must expressly define the standard of care in every negligence case involving complex equipment.[7]

---

[6] As a side note, it cannot be said that Clauser conceded that the applicable standard is limited to following the manual. Clauser agreed that it would be "reasonable for an equipment dealer to rely on a manufacturer's instructions for how to maintain that manufacturer's equipment," and that "nowhere in this manual does the manufacturer indicate that the gas struts on the doors are to be replaced or maintained at any regular interval." But nowhere did Clauser state that the absence of such an instruction absolved United Rentals, or a commercial renter of this type of equipment, from replacing the gas struts when reasonable care required it.

Indeed, Clauser stated in his report that "United Rentals is a major renter of this type of air compressor and as a sophisticated owner of this type of equipment should identify an expected life for these gas springs and establish a safe replacement frequency." He further stated that United Rentals' "failure to replace the subject gas spring before it failed catastrophically is more egregious since they had to replace the gas springs on the other door on the subject air compressor shortly (approximately two months) before this incident. Even with this warning that the springs were nearing the end of their service life they did not take the reasonable action of replacing all four springs."

[7] United Rentals relies on *Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000), for the proposition that "[c]ourts

The Third Circuit recently clarified that, under Pennsylvania law, whether expert testimony is required depends on "whether, given all the admissible evidence, the jury can answer it without speculating." *Slatowski v. Sig Sauer, Inc.*, 148 F.4th 132, 138-39 (3d Cir. 2025). The court identified three lines of cases: first, "experts are often needed in cases where the theory of harm is abstract or technical and so requires expert analysis"; second, "an expert is needed in products-liability cases where something seems to have gone very wrong with machinery, but the plaintiff is not sure what"; and, third, "no expert is needed when, even though the subject matter is complex, lay testimony can tell the story of causation." *Id*. In describing the third category, the court explained that "courts let juries decide causation based on eyewitness testimony paired with expert testimony that explained the complex background information." *Id*.

This case falls within the third category. Although gas struts and the mechanics of their operation are technical, the question whether United Rentals acted reasonably in maintaining rental equipment it owned and supplied does not turn solely on an expert's formal articulation of a standard of care. Clauser supplies the technical background regarding gas-strut failure, the hazard of an unsupported falling door, and the need to guard against end-of-life failure. The remaining questions—what United Rentals knew, what maintenance it undertook, whether it had reason to know the struts required replacement, and whether it acted reasonably under the circumstances—are questions a jury is equipped to resolve based on the full record before it

---

routinely grant summary judgment where a plaintiff fails to identify a governing standard that the defendant allegedly violated." But *Oddi* says no such thing. There, the Third Circuit affirmed summary judgment because it did "not believe that a juror could look at the front bumper and the flooring of the cab of the truck [Plaintiff] was driving and reasonably conclude, not only that its design was defective, but also that testing would have disclosed the defect and that it could have been remedied." *Id*. at 159. In other words, expert testimony was needed because the alleged defect and causal mechanism involved complex engineering matters that could not be resolved by lay inference alone. *Oddi* did not impose a categorical requirement that an expert recite the applicable standard of care in every negligence action involving complex equipment.

without speculation.

In addition to Clauser's expert testimony, Long has provided evidence that United Rentals is a sophisticated commercial equipment rental company that regularly deals with equipment similar or identical to the subject mobile air compressor. MacInnis testified that United Rentals is "the predominant leader in procurement of construction and rental equipment in the United States," and that Power Technique has sold United Rentals "[m]any, many thousands" of mobile air compressors over the years. Sowers corroborated this ongoing business relationship, confirming that United Rentals has dealt with Power Technique for "many, many years." Sowers also confirmed that United Rentals' personnel perform scheduled routine and preventative maintenance on Power Technique's mobile air compressors with regularity.

The record further establishes that gas struts have a limited useful lifespan, that United Rentals knew the role those struts performed on the subject machine, and that United Rentals knew gas struts were subject to failure and required replacement. MacInnis estimated that gas struts had an expected lifespan of "five or six years," and testified that it was "entirely possible that the charge inside [the strut] could be completely dissipated in one go." United Rentals also knew the work schedules of its customers and was provided the scope of work to which its rental equipment would be subjected. A jury therefore could infer that United Rentals was aware that the subject mobile air compressor rented by Nooter Construction and operated by Long was, in Long's words, "really taking a beating in regards to how [it was] run."

Sowers further testified that he was "sure" there were instances where United Rentals personnel had to replace gas struts on mobile air compressors. That testimony is corroborated by multiple United Rentals work orders indicating that gas struts on the subject machine had been replaced both upon customer request and unprompted, in advance of delivery to a customer.

22

From this evidence, a jury could conclude that United Rentals knew what was required to maintain the subject compressor in a reasonably safe condition, and that failing to do so could constitute a breach of its duty to act as a reasonable commercial equipment lessor.  Thus, this evidence is sufficient to permit a jury to determine whether United Rentals breached its duty to act as a reasonable commercial equipment lessor under the circumstances, without any specific expert testimony describing the applicable standard of care.

An appropriate order follows.

**BY THE COURT:**

**S/ WENDY BEETLESTONE**

**_____**

**WENDY BEETLESTONE, C.J.**